INDIANA STATE HIGHWAY COMMIS-
SION, Appellant-Plaintiff,

v.

Cletus ZILIAK and Ernestine Ziliak,
Appellees-Defendants.

No. 1–880A203.

Court of Appeals of Indiana,
First District.

Nov. 30, 1981.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Asst. Atty. Gen., Indianapolis, for appellant-plaintiff.

Ronald Warrum, Evansville, for appellees-defendants.

RATLIFF, Judge.

## STATEMENT OF THE CASE

The Indiana State Highway Commission appeals from a negative judgment upon its complaint for injunctive relief. We affirm.

## STATEMENT OF THE FACTS

Beginning in 1972 the Indiana State Highway Commission, pursuant to statutory authority, proposed to construct Interstate Highway I–164 in Vanderburgh County, Indiana, from Interstate 64 south to State Road 62 on the eastern edge of the county. Cletus and Ernestine Ziliak are the owners of real property located in the direct line of the proposed right-of-way of I-164. With permission of the Ziliaks' son in June 1977 and of Cletus Ziliak in April 1979 the Commission made two preliminary archaeological walking tours of the Ziliaks' property, the results of which led to the discovery of Indian artifacts and indicated to the Commission a need for further archaeological investigation. However, when the Commission later requested permission from the Ziliaks to conduct an intensive archaeological survey upon their property prior to the initiation of eminent domain proceedings, the Ziliaks refused. The Commission sought a preliminary and permanent injunction. On March 10, 1980, the trial court denied injunctive relief to the Commission in the following Findings of Fact, Conclusions of Law, and Judgment:

"Comes now the Court and upon evidence heard on the Plaintiff's Complaint for Preliminary Injunction, makes the following findings of fact, conclusions of law, and judgment:

### FINDINGS OF FACT

(1) The Indiana State Highway Commission is a commission of the State of Indiana, organized, establised [sic] and existing pursuant to the laws of the State of Indiana, hereinafter referred to as State.

(2) The State has the right to exercise the power of eminent domain.

(3) The State proposes to construct Interstate Highway #I–164 in Vanderburgh County, Indiana, from Interstate #64 south to State Road #62 on the eastern edge of Vanderburgh County.

(4) Defendants are the owners of property located in the center of the Northwest quarter of the Northeast quarter of the Southeast quarter of Section 13, Township 5 South, Range 10 West, which property is in the direct line of the proposed corridor of the above-mentioned Interstate #I–164.

(5) The State proposes to go on the Ziliaks' farm to dig for artifacts. To do the digging, the State proposes that the entire plow zone must first be removed, and the sub-soil dug into. The work is done either with a back hoe or with hand shovels, sometimes with both. The State may dig trenches six feet wide and 50 feet long, or 50 foot square holes, or many five foot square holes. No one knows how many trenches or holes will be dug under the State's proposal. This work will take from a few days to two months.

(6) The State proposes to do all this digging on the Ziliak farm without first exercising its power of condemnation or eminent domain.

(7) The digging proposed by the State is not a survey, within the ordinary and standard meaning of that word.

(8) There is no evidence that it is necessary for the State to dig for Indian artifacts on the Ziliak farm, as proposed, in order to construct a highway.

(9) There is no evidence that it is necessary to dig up the Ziliak farm, as proposed, before the State exercises its right of condemnation or eminent domain.

(10) There is no evidence at all concerning United States Public law 93–291, 93 Congress S. 154, 88 Stat. 174, although both the Court and counsel for the Ziliaks suggested that any such evidence be introduced at the trial.

(11) There is no evidence that it is necessary for the State to conduct any intensive archaelogical [sic] survey on the Ziliak farm in order to construct a highway.

(12) There is no evidence that it is necessary to conduct any intensive archaelogical [sic] survey on the Ziliak farm before exercising its right of condemnation or eminent domain.

(13) The State has already conducted three archaelogical [sic] expeditions upon the Ziliak farm, without permission and without complying with the applicable laws.

(14) During those three archaelogical [sic] expeditions upon the Ziliak farm, employees and agents of the State removed artifacts without the Ziliaks' permission and without any legal right.

(15) The State does not have the right or power to come on the Ziliak farm to do the proposed digging, without first exercising its power of condemnation or eminent domain.

(16) The Ziliaks have acted within their legal rights in their refusal to allow the State to dig upon their property.

(17) The Ziliaks' actions do not result in any irreparaable [sic] injury to the State. The State does have an adequate remedy at law.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and the subject matter, and the power to grant the requested relief, an injunction.

(2) The law is with the defendants, and against the plaintiff.

(3) The plaintiff does not have the right or the power to come on the Ziliak farm to do the proposed digging, without first exercising its power of eminent domain.

(4) The Ziliaks have acted within their legal rights in refusing to allow the State to dig upon their property.

(5) There has been no irreparable injury to the State.

(6) The State has an adequate remedy at law.

## JUDGMENT

The Court accordingly enters judgment for the defendants and against the plaintiff herein.

Edward A. Campbell
Honorable Edward A. Campbell,
Judge Warrick Superior Court"

## ISSUE

The only issue presented by the Commission is whether or not the trial court's judgment in this cause is contrary to law.

## DISCUSSION AND DECISION

■ At the outset we reiterate our standard of review in a case such as this. Where a party is appealing from a negative judgment, this court cannot consider an argument that the judgment is unsupported by the evidence. *Captain & Co. v. Towne*, (1980) Ind.App., 404 N.E.2d 1159. An appeal from a negative judgment will be successful only where the judgment is contrary to law. *Reynolds v. Meehan*, (1978) Ind. App., 375 N.E.2d 1119.

The Commission argues that the judgment of the trial court is contrary to law because "Indiana law, in conjunction with federal law, authorizes surveys of land for archaeological purposes prior to the exercise of the government's right of eminent domain." Appellant's brief at 9. In support of its position that it has authority to enter the Ziliaks' property for purposes of con-

ducting an intense archaeological survey such as it proposes here, the Commission cites us to Ind.Code 8–13–5–12 [1] and Ind. Code 32–11–1–1. [2]

1. IC 8–13–5–12 (Burns Code Ed.): "Purchase of lands—Eminent domain—Condemnation—Notice—Assessment of damages—Written report—Petition for review.—The Indiana state highway commission is hereby given the right, in the name of the state of Indiana, to purchase, or by voluntary grants and donations receive or otherwise acquire, lands and rights necessary for the construction, repair and maintenance of any state highway, and necessary for the relocating, widening or straightening of any state highway, or necessary for the clearing and removing of obstructions to the vision at highway crossings and curves, or for any other purpose or use contemplated by this act [8–13–5–1—8–13–5–21]. The state highway commission is hereby endowed with the right of eminent domain insofar as the same may be necessary or proper for the carrying out of the provisions of this act. If the state highway commission shall be unable to agree with the owner of the land or right, or with the guardian of such owner, touching the damages sustained by such owner, or touching the purchase price of the land or right, the state highway commission may proceed, in the name of the state of Indiana, in the exercise of the right of eminent domain with which it is under this act endowed, to condemn the land or right necessary or proper for the carrying out of the provisions of this act under the laws of this state. Whenever the state highway commission shall deem it necessary to acquire any real estate or right for any purpose contemplated in this act, it may adopt an appropriate resolution setting forth the description of the real estate or right sought to be acquired by it, the purpose for which the real estate is to be used, and such other facts as the state highway commission may deem necessary or pertinent, and shall refer such resolution to the attorney-general. Thereupon the attorney-general shall commence an action in the name of the state of Indiana in the proper court for the condemnation of the real estate or right described in such resolution and shall take all necessary and proper steps to secure the condemnation of the real estate or right. Any authorized employee or representative of the state highway commission engaged in the execution of any survey authorized by the commission, or by the chairman, may enter upon any lands or waters within this state for the purpose of inspecting, making soil and foundation investigations, leveling, transporting any equipment, or doing any work determined necessary to carry out any of the provisions of this act. However, before any authorized employee or representative of the state highway commission shall enter upon any lands or waters within this state, the occupant,

Indiana Code 8–13–5–12 endows the Commission with the power of eminent domain and provides that the Commission may make investigations in order to carry

if any, of the lands or waters shall be notified in writing by first class United States mail of such purpose at least five [5] days prior to the date of entry: Provided, however, That upon entry to any lands or waters the state highway commission employee or agent shall first present his written identification or authorization from the state highway commission to the occupier of the lands or waters, if available. If by such entry and if in the doing of such work as hereinabove provided any injury is done to the lands or waters entered upon, and any damages result from such injury or work, the aggrieved party shall be compensated therefor by the state highway commission out of the appropriate highway fund. If the aggrieved party is dissatisfied with the compensation as determined by the state highway commission the amount of damages shall be assessed by the county agricultural agent of the county wherein the lands or waters are located and two [2] other disinterested freeholders of the county, one [1] appointed by the aggrieved party and one [1] appointed by the state highway commission. A written report of the assessment of damages shall be mailed to the aggrieved party and the state highway commission by first class United States mail. However, if either the aggrieved party or the state highway commission is dissatisfied with the assessment of damages either or both may file a petition within fifteen [15] days after receipt of the report in the circuit or superior courts of the county in which the lands or waters are located, for a review thereof. [Acts 1933, ch. 18, § 18, p. 67; 1963, ch. 302, § 1, p. 515.]" However, Acts 1980, P.L. 74 § 436(b), p. 1077 provided that the repeal of this section is effective July 1, 1981.

2. IC 32–11–1–1 (Burns Code Ed., Repl.1980): "Entry, survey, effort to purchase, title.—Any person, corporation or other body having the right to exercise the power of eminent domain for any public use, under any statute, existing or hereafter passed, and desiring to exercise such power, shall do so only in the manner provided in this chapter except as otherwise provided herein. *Before proceeding to condemn, such person, corporation or other body may enter upon any land for the purpose of examining and surveying the property sought to be appropriated or right sought to be acquired*; and shall make an effort to purchase for the use intended such lands, right-of-way, easement or other interest therein or other property or right. In case such land or interest therein or property or right is owned by one who is of unsound mind or under eighteen [18] years of age, the person, corporation or other body seeking to obtain the land or interest

out the purposes of the act. In addition, it sets forth a procedure to be utilized prior to the entry upon real estate and for the payment of damages in the case of injury resulting from such investigation. We note, however that Acts 1980, P.L. 74 § 436(b), p. 1077 provides that the repeal of this section is effective July 1, 1981. Because "the repeal of a statute without a saving clause, where no vested right is impaired, completely obliterates it and renders it as ineffective as if it never existed," 26 I.L.E. *Statutes* § 195 at 380 (1960), and because "a political subdivision of the State . . . could not in and of itself acquire vested rights by virtue of legislative enactment," *State ex rel. Mass Transportation Authority of Greater Indianapolis v. Indiana Revenue Board*, (1969) 144 Ind.App. 63, 253 N.E.2d 725, 730, 255 N.E.2d 833, *cert. denied* 400 U.S. 877, 91 S.Ct. 117, 121, 27 L.Ed.2d 114, we must now ignore the authority of IC 8–13–5–12.

■ Indiana Code 32–11–1–1 which is currently effective provides that the Commission may examine or survey property before it initiates proceedings to condemn it. The question becomes, then, whether the word "survey" as used in the statute contemplates the intensive type of archaeological survey which the Commission proposes. We concur with the Ziliaks and the trial court that it does not. In the absence of legislative expression that words in a statute are to be given technical meanings, we shall give those words their plain, ordinary, and usual meanings. *Indiana Dept. of State Revenue v. Food Marketing Corp.*, (1980) Ind.App., 403 N.E.2d 1093, *trans. denied*. Our interpretation of the ordinary connotation of the word "survey" relates to an act of viewing and measuring surface areas. Here the Commission seeks to deny

the Ziliaks the use of their property for up to two months and to damage it by removing the topsoil and either digging holes of an unspecified depth that are five feet square or trenching five feet wide and sixty feet long. Clearly, this type of activity is not encompassed in the ordinary meaning of the term "survey." In fact, less destructive activity by a power company's surveyors was held by this court to constitute a "taking" of property. *See Indiana & Michigan Electric Co. v. Stevenson*, (1977) 173 Ind.App. 329, 363 N.E.2d 1254, *trans. denied*. In *Indiana & Michigan Electric Co.* we wrote in interpretation of IC 32–11–1–1 that "a public utility's right to enter private property for the purpose of examination and survey confers no license to engage in a course of destruction of crops, timber, etc." 363 N.E.2d at 1259. We conclude now likewise that the Commission's right to enter private property for the purpose of examination and survey confers no license to engage in the process of conducting archaeological digs.

■ We reach this conclusion in full awareness ·of the National Environmental Policy Act of 1969 (NEPA) legislation, and of Indiana's Environmental Policy Act. Indiana law is in harmony with the law of other jurisdictions in holding that where there is a history of federal-state involvement in a highway construction project, and more specifically where a project is programmed for Federal-Aid Highway Act assistance, compliance with NEPA is essential. *See Scottsdale Mall v. State of Indiana*, (7th Cir. 1977) 549 F.2d 484, *cert. denied* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750. This is true even were the Commission to change its mind and proceed from this point forward with only state funding. *Id.* One of the mandatory requirements for ob-

therein for such use may purchase the same of the regularly constituted guardian of such insane person or person under eighteen [18] years of age; and if such purchase shall be approved by the court or judge thereof appointing such guardian, and such approval written upon the face of the deed, such conveyance of the premises so purchased, and the deed made and approved by such court or judge, shall be valid and binding upon such insane person [or person] under eighteen [18] years of age. The

deed so given, when executed in lieu of condemnation, shall convey only the interest stated in the deed. Wherever land is taken by condemnation proceedings, the entire fee simple title thereto may be taken and acquired if such land is taken for the site of a station, terminal, powerhouse, substation, roundhouse, yard, car barn, office building or any other purpose except for a right-of-way. [Acts 1905, ch. 48, § 1, p. 59; 1973, P.L. 23, § 24.]" (Emphasis added.)

taining federal funds under NEPA, 42 U.S. C.A. § 4332(C)(1),[3] is the preparation of an environmental impact statement. *Id.; Upper Pecos Association v. Stans*, (10th Cir. 1974) 500 F.2d 17; *Citizens For Balanced Environ. & Transp., Inc. v. Volpe*, (D.Conn. 1974) 376 F.Supp. 806, *aff'd per curiam*, (2nd Cir. 1974) 503 F.2d 601, *cert. denied*

**3.** 42 U.S.C.A. § 4332 (1977):

"Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) *all agencies of the Federal Government shall—*

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) *include in every recommendation or report on proposals for* legislation and *other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—*

(i) *the environmental impact of the proposed action,*

(ii) any adverse environmental effects which cannot be avoided should the proposals be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has state-wide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[*]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100; *Lathan v. Volpe*, (9th Cir. 1971) 455 F.2d 111, *reh. denied* (1972), on remand (W.D. Wash.1972) 350 F.Supp. 262. Indiana's Environmental Policy Act, *viz.*, Ind.Code 13–1–10–3,[4] in part parallels 42 U.S.C.A. § 4332(C)(1) almost verbatim, thus, would be subject to the same interpretation. *See Scottsdale Mall v. State of Indiana, supra.* We note, however, that there is nothing in the language of either the federal or the state statutes which would require an environmental impact statement to be made prior to initiation of condemnation proceedings. The trial court's judgment, therefore was not contrary to law.

Judgment affirmed.

NEAL, P. J., and ROBERTSON, J., concur.

Pub.L. 91–190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94–83, Aug. 9, 1975, 89 Stat. 424.
[*] So in original." (Emphasis added.)

4. Ind.Code 13–1–10–3 (Burns Code Ed., Repl. 1981): "Activities authorized.—The general assembly authorizes and directs that, to the fullest extent possible:
(1) the policies, regulations and laws of the state of Indiana shall be interpreted and administered in accordance with the policies set forth in the [this] chapter, and;
(2) *all agencies of the state shall*:
(a) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and decision-making which may have an impact on man's environment;
(b) identify and develop methods and procedures which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations:
(c) *include in every recommendation or report on proposals for legislation and other major state actions significantly affecting the quality of the human environment, a detailed statement by the responsible offical on—*
(i) *the environmental impact of the proposed action,*
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(b) *In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the state of Indiana to use all practicable means, consistent with other essential considerations of state policy, to improve and coordinate state plans, functions, programs and resources to the end that the state may*:
(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
(2) assure for all citizens of Indiana safe, healthful, productive, and esthetically and culturally pleasing surroundings;
(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
(4) *preserve important historic, cultural, and natural aspects of our national heritage,* and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;
(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.
(c) The general assembly recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment. [IC 13–1–10–2, as added by Acts 1972, P.L. 98, § 1.]" (Emphasis added.)